[Civ. No. 3336. First Appellate District, Division One.—July 23, 1920.]

## JAMES B. F. MILLAR, Respondent, v. CHARLES H. BELL et al., Appellants.

[1] DEEDS — CONVEYANCE WITHOUT CONSIDERATION — GOOD FAITH OF GRANTEES—EQUITY.—Where the owner of an undivided interest in certain real property, while in dire need of a comparatively small sum of money, and in some measure for the purpose of procuring an advance of such amount, his judgment probably impaired by alcoholic excesses, conveys that interest to his sister and his brother-in-law, without receiving therefor any adequate consideration, imposing in them the greatest trust and confidence, and being convinced that in urging the alienation of his property they were doing so for the purpose of protecting and preserving his interest therein and that it would eventually be returned to him, such conveyance will be set aside by a court of equity, notwithstanding the grantees acted in the highest good faith and exercised their best judgment for the protection of his interest and, following the transfer, voluntarily paid or caused to be paid to him a given sum every month and made provision for continuing such payment during the term of his life.

[2] ID.—DISAFFIRMANCE OF TRUST—ACCEPTANCE OF VOLUNTARY PAYMENTS—ESTOPPEL TO ASSERT INVALIDITY.—The act of the grantor in executing such deed was not legally ratified by him so as to estop him from asserting the invalidity of the transfer and bringing an action to compel its cancellation, by his acceptance of the monthly payments after he became aware that the grantees denied any legal obligation resting upon them as a result of the conveyance to them of the property, especially when the element of compulsion which accompanied its execution was not removed and the money he received was equitably his own.

APPEAL from a judgment of the Superior Court of Alameda County.  Dudley Kinsell, Judge.  Affirmed.

The facts are stated in the opinion of the court.

Morrison, Dunne & Brobeck, H. W. Clark and Arthur W. Bolton for Appellants.

Edgar C. Chapman for Respondent.

RICHARDS, J.—This action was brought by the plaintiff for the cancellation of a deed of conveyance of an undivided one-third interest in the real property described in the complaint which he had executed and delivered to the defendants Charles H. Bell and Mary E. Bell by reason of the alleged coercion and breach of confidence of said Charles H. Bell.  He also prayed for the cancellation of a deed of trust executed by said defendants to their codefendant Mercantile Trust Company.  By its judgment the court granted the relief sought, and the defendants have appealed.

It is contended by them that the judgment is not supported by the evidence, for the reason that the evidence shows, first, that the deed of conveyance in question was freely and voluntarily executed by the plaintiff, and, second, that after discovery of the facts upon which the plaintiff bases his right of rescission and cancellation he ratified his act in executing said deed.

Findings were waived by the parties, but the record contains all of the evidence taken at the trial.

[1] As might be expected in an action of this character, the evidence is strongly conflicting, but resolving that conflict in favor of the version of the transaction adopted by the trial court in arriving at its judgment, the facts may be summarized as follows: Charles H. Bell is the brother-in-law of James B. F. Millar, the plaintiff, and Mary E. Bell is his wife and the sister of James.  The father of the latter died about six months before the occurrence of the events out of which the present litigation arose, leaving an estate of the value of about one hundred and eighty thousand dollars, consisting principally of real property, one-third of which was bequeathed and devised to his said son.  James had contracted the habit of drinking intoxicating liquors to

excess, and when under the influence of this habit spent his money recklessly and contracted debts; indeed, on several occasions, for the purpose of procuring means to continue his excesses, he had resorted to the forgery of checks. On said occasions his brother-in-law had proved to be a staunch and loyal friend and invariably came to his assistance. In the early part of November, 1915, James was in urgent need of money, and so by letter informed Mr. A. E. Bolton, the attorney for the executors of his father's estate, and who had long been the attorney for James Millar, Sr., the father, and was intimately acquainted with the members of the family. James' father had been aware of his son's weakness and had realized that he might at some time be in trouble as a result thereof, and had expressed the desire to his attorney and friend, Mr. Bolton, that he come to his boy's aid should occasion arise. James at this time was residing in Dinuba, there engaged in the practice of dentistry, earning thereby some two thousand or three thousand dollars a year. Upon receipt of his letter Mr. Bolton consulted with Charles H. Bell. They both realized that this demand of James for money indicated that if something were not done to control him he would probably upon coming into his share of his father's estate rapidly dissipate it in unwise and reckless expenditure when in his periodical debauches. They decided to visit James at Dinuba and talk things over. They accordingly did so, and there proposed to him that he should enter into some arrangement by which he would be protected from dissipating the inheritance of which he was soon to come into control. Several methods were suggested —one, that a guardian be appointed for James' estate; another, that an annuity be purchased for him; and, again, that his property be placed in trust for his benefit. James refused to consider the proposed guardianship or the annuity, and they were not pressed, but it was made to appear quite plainly to him by his brother-in-law that unless he entered into some such arrangement he need expect no financial aid in his embarrassment. It is even testified by James that his brother-in-law at this time referred pointedly to his infractions of the law above mentioned and hinted at unpleasant consequences if he remained obdurate—which, however, seems quite improbable and in all likelihood found little credence in the trial court. At the conclusion of the

interview Mr. Bell and Mr. Bolton advised James to consult
a lawyer, make up his mind what he wanted to do, and to
let them know. Testifying as to this interview Mr. Bolton
said: "The main thing at Dinuba was to get into his mind
that something had to be done, and that is all that was ac-
complished then." A few days thereafter, on November
15, 1915, James appeared in the law office of Mr. Bolton,
in San Francisco, ready to enter into some arrangement for
the purpose of carrying out the object suggested by his
brother-in-law on the visit to him at Dinuba. He had not
consulted an attorney, deeming it unnecessary to do so in
view of his confidence in both Mr. Bell and Mr. Bolton and
their known and appreciated friendship for him. In the
meantime Mr. Bolton had given the matter some thought,
and had arrived at the conclusion that in order to effectually
protect James from the possibility of dissipating his inheri-
tance and to assure him of future maintenance, the only
feasible thing for James to do was to make an absolute deed
of all his property to some person in whom he had con-
fidence. It was explained to him by Mr. Bolton that if he
did so he would no longer have control of it, nor could he
direct such person in the expenditure of the funds derived
therefrom. This fact was also emphasized by Mr. Bell when
the plan proposed to be adopted was made known to him.
According to the testimony of Mr. Bolton, James expressed
the desire that Mr. Bell be named as such grantee, while the
plaintiff's recollection of this part of the transaction is that
the deed was presented to him for signature with Mr. Bell's
name therein as grantee without any previous discussion of
such selection. Mr. Bell at first strongly demurred to hav-
ing the conveyance made to him, and insisted to James that
it be made to the latter's sister and brother. This James
would not consent to, but was willing that such a convey-
ance be made to his sister and Mr. Bell jointly, energetically
protesting his greater confidence in Mr. Bell than in his
brother. There was much discussion before this decision
was finally reached, as a result of which James derived the
conviction that, although he was executing an absolute deed
to his property he would still receive the benefit of it. Evi-
dently there was some assurance given him that he would
receive a monthly allowance of two hundred dollars, for Mr.
Bell himself testifies that upon James saying he would like

to have three hundred dollars, he replied: ''Well, two hundred dollars would be enough, but I promise you nothing. I refuse to make you any promises.'' This witness also testifies to a like categorical refusal to make any promises when James stated that his understanding was that the property would be returned to him in five years' time; but as to this, James testified that such was the understanding. Mr. Bolton, testifying to this interview and the attitude of James and the effect of the discussion and negotiations upon his mind, said: ''In talking with Jimmie [the plaintiff] it was talked with Jimmie that a trust could be made. . . . I apprehend that it might be fair to state that Jimmie thought it would be put in trust. . . . There was enough said, to be perfectly frank with everybody, there was enough said in the transaction, considering the knowledge that Jimmie had of Dr. Bell —Jimmie would have had a fair right to have assumed. . . . 'Well, if I brace up as a man Dr. Bell would convey this property back to me.' ''

The deed to Charles H. Bell and Mary E. Bell being executed, there was advanced to James sufficient money—about one thousand dollars—to meet his pressing obligations, and thereafter Mr. Bell sent to him the sum of two hundred dollars monthly until, in March, 1916, Mr. Bell and his wife made a deed of trust of the property theretofore conveyed to them by James to the Mercantile Trust Company for the purpose of paying to James during his lifetime the sum of two hundred dollars monthly, reserving, however, a power of revocation. In the meantime distribution of the estate of James Millar, Sr., was had, James' one-third interest therein being distributed to the Mercantile Trust Company, to be subject to the terms of said deed of trust. Immediately after said distribution a suit was commenced for the purpose of partitioning the real property thus distributed in undivided interests to the heirs or assigns of said deceased, to which said James was made a party defendant by virtue of the interest therein created in his favor by said deed of trust so executed to the Mercantile Trust Company. The summons and complaint were served upon him, but except for assisting in the actual physical partition of the lands, he took no active interest in the suit. His connection with it may be gathered from a letter written to him by Mr. Bolton wherein he said: ''The complaint will set forth the facts

that distribution has been had, that it is desirable that partition be had according to the respective rights of the parties, and so forth. It will then be necessary for you and the other parties in interest to file an answer to the complaint admitting the facts as set forth therein and requesting that partition be had. It is impossible for me to appear as attorney for both the defendants and the plaintiffs in the action; therefore I am inclosing herewith an authorization to be signed by you authorizing Mr. J. S. Shuman to appear for you in that action. Of course this is only a matter of form, and I will prepare all the papers in the office, and I will then have him sign them as attorney.''

In order to give point to the contention of the appellants that the plaintiff ratified his deed of conveyance after discovery of fact claimed by plaintiff to confer upon him the right of rescission, one other detail should be added: On October 6, 1916, the plaintiff addressed to Charles H. Bell and Mary E. Bell a written notice of rescission and cancellation of his conveyance of October 15, 1915, stating therein as grounds for such action that said conveyance had been made without any valuable consideration, and at a time when he was incapable of managing his affairs, and was made under menace, duress, and undue influence. At the same time the plaintiff employed an attorney in Dinuba, a Mr. Smith, to look into the facts and circumstances attending his execution of said conveyance. Mr. Smith visited Mr. Bolton at his office in San Francisco, and was shown the deed or a copy thereof, also the deed of trust to the Mercantile Trust Company, and was informed of the reasons for and circumstances connected with their execution. He was also invited by Mr. Bolton to offer any suggestions that he might have to make in the interest of his client. Mr. Smith returned to Dinuba, and there the matter dropped until the commencement of the present action some two years later.

We have no difficulty upon the foregoing facts in arriving at the conclusion that the judgment is supported by the evidence. While recognizing that the grantees named in the plaintiff's deed of conveyance and Mr. Bolton acted in the highest good faith and exercised their best judgment for the protection of the interests of the plaintiff, the fact still remains that when in dire need of a comparatively small sum

of money, and in some measure for the purpose of procuring
an advance of such amount, his judgment probably impaired
by alcoholic excesses; being convinced that in urging the
alienation of his property they were doing so for the pur-
pose of protecting and preserving his interest therein and
that it would eventually be returned to him; imposing in
them a trust and confidence merited by long intimacy with
his family and personal friendship and kindness to himself,
by said deed he, without receiving therefor any adequate
consideration, stripped himself of practically all he possessed
in the world.   To be sure, the grantees in said deed have
since its execution voluntarily paid or caused to be paid to
him the sum of two hundred dollars every month and have
made provision for continuing this payment during the
term of his life; but there is no legal compulsion upon them
to do so, and they have the right and power to discontinue
these payments at any time, and while there is nothing in
the record to indicate that that contingency is likely to arise,
neither a court of law nor equity would be warranted in
assuming that they will never do so, especially if irritated
or their feelings wounded by what they might justly con-
sider ungrateful or inconsiderate conduct on the part of the
plaintiff, or by acrimonious litigation.   In a transaction
where the elements of trust and confidence enter as largely
as in the present case a court of equity will not be slow to
lend its aid where the absence of any of the essentials of a
valid transfer of property is fairly established.   We think
the facts above set out, resolving any conflict concerning
them in favor of the judgment of the trial court, fairly
disclose such a case, and that the trial court was justified in
setting aside the plaintiff's conveyance, unless the evidence
established, according to the contention of the appellants, a
legal ratification by its grantor.

Two circumstances are urged by the appellants as having
this effect, namely, the continued acceptance by plaintiff of
the monthly payment of two hundred dollars after he be-
came aware that the defendants denied any legal obligation
resting upon them as a result of the conveyance by plaintiff
to them of his property, and the fact that the plaintiff as a
defendant in the partition suit referred to above failed to
set up therein any claim to the property therein sought to
be partitioned, but acquiesced in the distribution of the one-

third thereof that he now claims to the Mercantile Trust Company under the terms of the deed of trust executed by Charles H. Bell and his wife.

[2] We do not think the first of these facts can be given the effect claimed for it by the appellants. If the transaction was as contended by them an absolute conveyance, imposing no obligation upon them, then such payments were not made by virtue of the terms of that transaction, so that the acceptance of such payments cannot be regarded as a recognition of its validity; and if the transaction is to be regarded as of the character testified to by the plaintiff, and that such payments were in accordance with its terms, it still remains the fact that the money so paid was a part—and a part only—of the income produced by the property so conveyed by him and which, according to his understanding of the transaction, was to be used for his benefit. His acceptance of such payments cannot therefore be said to estop him to assert the invalidity of his transfer, especially when the element of compulsion which accompanied its execution is not shown to have been removed, and the money thus received was equitably his own.

As to the plaintiff's conduct with regard to the partition suit, by which he apparently acquiesced in the distribution of his property to the Mercantile Trust Company, it is very evident from the terms of Mr. Bolton's letter above given that the plaintiff's participation therein was purely perfunctory and nominal, and that he was entitled by reason of those confidential relations between him and Mr. Bolton (who was conducting said partition suit), to which we have already referred, to assume that nothing would result therefrom with regard to his property interests contrary to the understanding which, according to the trial court, he was justified in deriving from the negotiations culminating in the aforesaid conveyance of his property.

Entertaining these views, we are of the opinion that the judgment should be affirmed, and it is so ordered.

Waste, P. J., and Koford, J., *pro tem.*, concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 20, 1920.

All the Justices, except Olney, J., concurred.